| | |
|---|---|
| | **UNITED STATES DISTRICT COURT** |
| | **CENTRAL DISTRICT OF CALIFORNIA** |
| | **EASTERN DIVISION** |

| | |
|---|---|
| MAURICIO VILLARREAL, JR., | ) No. ED CV 10-1124-PLA |
| Plaintiff, | ) |
| v. | ) **MEMORANDUM OPINION AND ORDER** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) |
| Defendant. | ) |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on August 11, 2010, seeking review of the Commissioner's denial of his application for Disability Insurance Benefits. The parties filed Consents to proceed before the undersigned Magistrate Judge on August 20, 2010, and August 23, 2010. Pursuant to the Court's order, the parties filed a Joint Stipulation on April 5, 2011, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## BACKGROUND

Plaintiff was born on September 22, 1980. [Administrative Record ("AR") at 36, 95.] He has a high school education and has past work experience as a warehouse worker and forklift operator. [AR at 98-104.]

Plaintiff protectively filed his application for Disability Insurance Benefits on January 19, 2007,[1] alleging that he had been unable to work since June 21, 2006, due to mental health problems. [AR at 9, 95-104.] After his application was denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 40-52.] A hearing was held on September 8, 2008, at which plaintiff appeared with counsel and testified on his own behalf. [AR at 16-35.] A medical expert and plaintiff's mother also testified. [AR at 25-35.] On October 15, 2008, the ALJ issued an unfavorable decision. [AR at 6-15.] On June 24, 2010, the Appeals Council denied plaintiff's request for review of the hearing decision. [AR at 1-3.] Plaintiff then filed this action.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257. When determining whether substantial evidence exists to support the Commissioner's

---

[1] A Field Office Disability Report dated January 19, 2007, lists plaintiff's Protective Filing Date as January 19, 2007. [AR at 95-97.] The ALJ stated that plaintiff filed his application for Disability Insurance Benefits on January 18, 2007. [AR at 9.]

decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

## IV.

## **EVALUATION OF DISABILITY**

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

### A. THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled, and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made, and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed, and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

sufficient "residual functional capacity" ("RFC")[2] to perform his past work. If the claimant has an RFC sufficient to perform his past work, the claimant is not disabled, and the claim is denied. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving that he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. Id. The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy. Id. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ concluded that plaintiff has not engaged in any substantial gainful activity since June 21, 2006, the alleged onset date of disability.[3] [AR at 11.] At step two, the ALJ concluded that plaintiff has the following non-severe medically determinable impairments: mood disorder and polysubstance disorder in early remission. [AR at 11-15.] Finding plaintiff's impairments non-severe, the ALJ determined that plaintiff was not disabled as of June 21, 2006, through the date of the decision, October 15, 2008. The ALJ did not proceed to the remaining steps in the sequential analysis. [AR at 15.]

**V.**

**THE ALJ'S DECISION**

Plaintiff contends that the ALJ failed to: (1) properly consider the treating psychiatrist's

---

[2] RFC is what a claimant can still do despite existing exertional and nonexertional limitations. Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

[3] The ALJ also found plaintiff insured for Disability Insurance Benefits purposes through December 31, 2010. [AR at 11.]

opinion and Global Assessment of Functioning ("GAF")[4] scores, (2) make proper credibility findings and properly consider plaintiff's subjective symptoms, (3) find that plaintiff's mental condition is severe. [See Joint Stipulation ("JS") at 2-8, 12-15, 18-22.] As set forth below, the Court agrees with plaintiff and remands the matter for further proceedings.

**A.  PLAINTIFF'S MENTAL IMPAIRMENT**

Plaintiff argues that the ALJ erred in finding his mental impairment not severe. Specifically, plaintiff contends that the ALJ did not properly consider his treating psychiatrist's opinion and assignment of GAF scores.

The record reveals that plaintiff has a long history of mental health treatment. Plaintiff suffered a period of depression in 1999 when he served in the army for nine months; he reportedly "tried very hard [in the army,] but [was] severely criticized as 'not good enough,'" experienced suicidal ideation, and was discharged. [AR at 127, 131, 166.] The record details plaintiff's mental heath treatment beginning on December 6, 2006, continuing through July 18, 2008. [AR at 125-33, 148-56, 160-210.]

On December 6, 2006, plaintiff underwent a clinical assessment at the San Bernardino County Department of Behavioral Health at which he complained of low self-esteem, sadness, thoughts of dying, isolation, loss of interest in people and his social environment, inability to find or maintain a job, paranoia that people talk about him and believe that he should shoot himself, impaired family and occupational functioning due to depression, difficulty getting along with others, oversleeping, and overeating. [AR at 125-28.] Plaintiff reported that he wanted to shoot himself, but that he did not have a gun and that suicide was against his religious beliefs. [AR at 126, 129.] Plaintiff's mother attended the assessment and stated that plaintiff had been depressed, "isolat[ed] in his room," asocial, and suffering from "very low self-esteem" for about one year. [AR at 129.]

---

[4] A GAF score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 32 (4th Ed. 2000).

At that time, plaintiff had not taken any psychotropic medications, but reported previously using alcohol, cocaine, marijuana, and methamphetamine.[5] [AR at 125.] According to the assessment, plaintiff appeared paranoid, psychotic, preoccupied, and depressed and had poor insight, poor judgment, and a flat affect. [AR at 128.] Plaintiff was diagnosed with "Major Depressive Disorder, Recurrent, Severe with Psychotic Features," alcohol dependence, amphetamine dependence, and cocaine dependence, and was assessed a GAF score of 43.[6] [AR at 130.]

On January 16, 2007, Dr. Sean Faire performed a psychiatric evaluation at which plaintiff continued to complain of depression, but reported great improvement in his mood and decreased negative thoughts since beginning to take medications two months earlier. [AR at 131.] Plaintiff reported experiencing suicidal ideation, but no suicide attempts, over the previous year. [AR at 131.] Plaintiff sought prescriptions for refills of his medications. [AR at 131.] According to Dr. Faire's report, plaintiff was occasionally still drinking alcohol, but had stopped using cocaine, marijuana, and methamphetamine. [AR at 131.] Dr. Faire evaluated plaintiff's insight and judgment as "fair;" diagnosed plaintiff with major depression recurrent with psychotic features, alcohol dependence, and cocaine dependence; assessed plaintiff with a GAF score of 45;[7] and prescribed refills of plaintiff's medications. [AR at 132.] After failing to attend four medication visits scheduled with Dr. Faire, plaintiff attended an April 4, 2007, medication visit at which Dr. Faire observed plaintiff's "very good affect" and noted that plaintiff reported improved mood and no recent auditory hallucinations. [AR at 149-53.]

---

[5] The dates on which plaintiff reported last using cocaine and methamphetamine are difficult to decipher from the record, i.e., whether he last used the substances months or years earlier. [AR at 125.] However, it is clear from the record that plaintiff reported at the December 6, 2006, treatment visit that he last used alcohol two weeks earlier and that he last used marijuana in 2000. [AR at 125.]

[6] A GAF score of 41-50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV, at 34.

[7] See supra note 6.

Soon after, however, on April 12, 2007, plaintiff was held at Arrowhead Regional Medical Center under California Welfare and Institutions Code section 5150, because he posed a danger to himself. [AR at 204.] Plaintiff reported choking himself approximately two-and-one-half years earlier and alleged that he had attempted to kill himself earlier that day. [AR at 204, 209.] Plaintiff reported a history of auditory and visual hallucinations and stated that his medications alleviated his hallucinations, but that he had not taken his medications that day or the day before. [AR at 209.] According to a Suicidality Assessment of plaintiff's condition, plaintiff experienced recurrent suicidal ideation, recurrent depression, and current substance and alcohol abuse. [AR at 204.] While plaintiff appeared alert and to have intact memory, he was depressed, had a "restricted" affect, and reported having "extreme fears" and being "shaken up." [AR at 205, 209.] His "thought form/content" was "slowed," "guarded," and "restricted" and evidenced "thought blocking" and "paucity of content." [AR at 205.] He exhibited psychotic symptoms, including paranoid delusions and auditory hallucinations. [AR at 205.] The admitting physician described plaintiff as having a "grave disability" involving "emotional disorganization," diagnosed him with Schizoaffective Disorder,[8] and assessed him with a GAF score of 30.[9,10] [AR at 206-07.] The record indicates that at a medication visit two months later on June 12, 2007, plaintiff reported "doing very well" on his medication regimen, and Dr. Faire noted that plaintiff "continue[d] to hold gains in mood stability." [AR at 167.]

---

[8] The admitting physician also assigned plaintiff an Axis I diagnosis of 305.90. Under DSM-IV, an Axis I diagnosis of 305.90 refers to Caffeine Intoxication, Inhalant Abuse, Other Substance Abuse, or Phencylidine Abuse. DSM-IV, at 232, 259, 279, 295.

[9] A GAF score of 21-30 denotes "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriate, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." DSM-IV, at 34.

[10] The record is difficult to decipher, but it appears that plaintiff was discharged to his mother with instructions to resume his medications. [AR at 207.]

However, after another two months passed, plaintiff was admitted on August 13, 2007, on another 5150 hold to Arrowhead Regional Medical Center.[11] [AR at 183-84.] Plaintiff was held as a danger to himself through August 23, 2007, because he was experiencing auditory hallucinations commanding him to kill himself with a knife and had reportedly tried to hang himself eight months earlier. [AR at 181, 183, 190.] According to plaintiff's mother, plaintiff had been on a tapering dose of medications and had eventually stopped taking his medications because he could not afford them anymore. [AR at 183.] According to the discharge summary, plaintiff stopped taking his medications two months prior to his second 5150 hold. [AR at 181.] During the two weeks leading up to his second hospitalization, plaintiff had been "increasingly preoccupied, isolative, talking to himself, hearing voices, and becoming progressively psychotic and depressed." [AR at 183.]

Dr. Larry Lawrence performed a psychiatric evaluation of plaintiff during his admission to the hospital and found that plaintiff was "not functional," his thinking was "tangential" and demonstrated a "really significant paucity of content," his affect was "significantly restricted and constricted," and he appeared to have a significant cognitive impairment, "significant psychosocial isolation," and "a good deal of blocking." [AR at 183.] During the psychiatric evaluation, plaintiff stated that he hears "the voices" and "the word hatred." [AR at 183.] Dr. Lawrence gave plaintiff a primary diagnosis of "Schizoaffective disorder, depressed," a secondary diagnosis of "[o]ther substance abuse," and a GAF score of 15.[12] [AR at 183.] The record indicates that plaintiff's best GAF score was 50[13] during the past year. [AR at 183.] Dr. Lawrence prescribed plaintiff various medications for his agitation. [AR at 181, 183-84.] Since he found that plaintiff "continue[d] to be

---

[11] The record indicates that plaintiff was admitted to Arrowhead Regional Medical Center both on August 13, 2007, and on August 15, 2007, but it appears that plaintiff was held at the medical center continuously from August 13, 2007, through August 23, 2007. [AR at 181-203.]

[12] A GAF score of 11-20 denotes "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) . . . ." DSM-IV, at 34.

[13] See supra note 6.

at significant risk of suicidal attempt," Dr. Lawrence admitted plaintiff for inpatient services and placed him on "line-of-sight" to prevent suicide. [AR at 183, 190.]

During plaintiff's hospitalization, he "remained isolative, withdrawn, [and] with depressed mood;" continued to experience auditory hallucinations telling him to kill himself; stated a plan of "get[ting] a gun and shoot[ing] [him]self;" and explained that he wished to kill himself because he was "lonely," "miserable," and "had no plans." [AR at 181.] According to an August 16, 2007, psychosocial assessment, plaintiff had persecutory delusions, poor impulse control, and "limited" judgment. [AR at 200.] The assessment also revealed a number of psychosocial stressors impacting plaintiff, including prior noncompliance with medications, mental illness, substance abuse, a lack of coping skills, and a dysfunctional family system. [AR at 202.] The assessor concluded that plaintiff had limited readiness for psychoeducation and that the primary high-risk psychosocial stressors causing his instability were his suicidal thoughts, undisclosed suicidal plans, depression, alcohol, and family-induced low self esteem and anxiety. [AR at 202-03.] Based upon that assessment, plaintiff was diagnosed with a psychotic disorder, not otherwise specified. [AR at 203.] On August 20, 2007, plaintiff was prescribed additional medications for his depression. [AR at 182.] Upon discharge on August 23, 2007, he was instructed to continue taking various medications. [AR at 182.] At discharge, plaintiff was again diagnosed with "Schizoaffective disorder, depressed" and assigned a GAF score of 60.[14] [AR at 181.]

Five days later, on August 28, 2007, Dr. Faire prescribed plaintiff refills of his medications. [AR at 169.] Then, on September 14, 2007, plaintiff began experiencing severe chest pain, which he believed to be a reaction to his medications. [AR at 165.] Plaintiff went to an emergency room. [AR at 164.] A myocardial infarction was ruled out, but plaintiff continued to experience chest pain as of September 20, 2007. [AR at 164.] At an October 16, 2007, medication visit with Dr. Faire at which plaintiff reported that he still felt depressed, Dr. Faire discussed with plaintiff that his chest pain may have been symptomatic of severe anxiety. [AR at 162.] Shortly thereafter, plaintiff

---

[14] A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" DSM-IV, at 34.

9

transferred from the care of Dr. Faire to Dr. Carlos Pequeno. [AR at 160.] At a March 7, 2008, medication visit, Dr. Pequeno noted that plaintiff had been off his psychiatric medications for one week and that "social isolation [was] an active problem" for him. [AR at 172.] At a May 9, 2008, medication visit, Dr. Pequeno noted plaintiff's anger outbursts and social isolation problem. [AR at 171.] Lastly, the record indicates that at a July 18, 2008, medication visit, Dr. Pequeno advised plaintiff to stop drinking alcohol and to attend substance abuse therapy. [AR at 170.]

In sum, plaintiff was assessed GAF scores of 43, 45, 30, 15, and 60 on December 6, 2006, January 16, 2007, April 12, 2007,[15] August 13, 2007, and August 23, 2007, respectively. [AR at 130, 132, 181, 183, 207.] In addition, the record indicates that plaintiff's highest GAF score during the year prior to August 13, 2007, was 50. [AR at 183.]

A "severe" impairment, or combination of impairments, is defined as one that significantly limits physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520, 416.920. "The Supreme Court has recognized that including a severity inquiry at the second stage of the evaluation process permits the [Commissioner] to identify efficiently those claimants whose impairments are so slight that they are unlikely to be found disabled even if the individual's age, education, and experience are considered." Corrao v. Shalala, 20 F.3d 943, 949 (9th Cir. 1994) (citing Bowen v. Yuckert, 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)). However, an overly stringent application of the severity requirement would violate the statute by denying benefits to claimants who meet the statutory definition of "disabled." Corrao, 20 F.3d at 949 (citing Bowen v. Yuckert, 482 U.S. at 156-58 (O'Connor, J., concurring)). Despite use of the term "severe," most circuits, including the Ninth Circuit, have held that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing Bowen v. Yuckert, 482 U.S. at 153-54); see Hawkins v. Chater, 113 F.3d 1162, 1169 (10th Cir. 1997) ("A claimant's showing at level two that he or she has a severe impairment has been described as 'de minimis.'") (citation omitted). An impairment or combination

---

[15] It is unclear whether the GAF score of 30 was assessed on April 12, 2007, or April 13, 2007. [AR at 207.]

10

of impairments should be found to be not severe only when the evidence establishes merely a slight abnormality that has no more than a minimal effect on an individual's physical or mental ability to do basic work activities. See Corrao, 20 F.3d at 949 (citing Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988)); see also Social Security Ruling ("SSR")[16] 85-28 ("[A]n impairment is not severe if it has no more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities"); Hudson v. Bowen, 870 F.2d 1392, 1396 (8th Cir. 1989) (holding that an evaluation can stop at step two only when there is no more than minimal effect on ability to work).

Here, in explaining his conclusion that plaintiff's medically determinable impairment was not severe, the ALJ noted that plaintiff had received a GAF score of 43 [AR at 13], which was assessed on December 6, 2006. [AR at 130.] The ALJ discussed the import of this score only to the extent that he commented that "progress notes dated January 16, 2007, state that [plaintiff] started medications two months ago and reported 'great improvement.'" [AR at 13.] The ALJ did not discuss, or even mention, any of plaintiff's other GAF scores. Also in support of his step two determination of non-severity, the ALJ stated that "[t]he records do not reflect any acute mental health crisis requiring inpatient hospitalization or intensive treatment" [AR at 13], a conclusion which the record belies, since plaintiff was twice held as a danger to himself, with the second hospitalization lasting ten days.[17] [AR at 181-210.]

It thus appears that the ALJ rejected the treating physicians' assessments of plaintiff's GAF scores, but did so without providing an express reason. In evaluating medical opinions, the case law and regulations distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). See 20 C.F.R. §§ 404.1502, 404.1527, 416.902, 416.927; see also Lester, 81 F.3d

---

[16] SSRs do not have the force of law. Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

[17] The records from plaintiff's second hospitalization were submitted after the ALJ hearing, but were considered by the Appeals Council. [AR at 4.]

at 830.  Generally, the opinions of treating physicians are given greater weight than those of other physicians, because treating physicians are employed to cure and therefore have a greater opportunity to know and observe the claimant.  Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007); Smolen, 80 F.3d at 1285.  Despite the presumption of special weight afforded to treating physicians' opinions, an ALJ is not bound to accept the opinion of a treating physician.  However, the ALJ may only give less weight to a treating physician's opinion that conflicts with the medical evidence if the ALJ provides explicit and legitimate reasons for discounting the opinion.  See Lester, 81 F.3d at 830-31 (the opinion of a treating doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record); see also Orn, 495 F.3d at 632-33 ("Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is 'still entitled to deference.'") (citations omitted); SSR 96-2p (a finding that a treating physician's opinion is not entitled to controlling weight does not mean that the opinion is rejected).

      Here, the ALJ's failure to provide any reasons for rejecting plaintiff's GAF scores constitutes error warranting remand, since an ALJ is required to provide specific and legitimate reasons based on substantial evidence in the record for rejecting a treating physician's findings (Lester, 81 F.3d at 830; see Ramirez v. Shalala, 8 F.3d 1449, 1453-54 (9th Cir. 1993)).  While the GAF scores cited above -- without more -- may not be determinative of the issue of disability, the Court is aware of no authority asserting that GAF scores and their implications -- especially scores from treating sources -- may be improperly rejected, as was done here.  Plaintiff's scores indicate at least a moderate impairment, and possibly a major impairment, in social and occupational functioning.  Even if not directly translatable into Social Security terminology, the scores may be probative of plaintiff's condition.  See Olds v. Astrue, 2008 WL 339757, at *4 (D. Kan. Feb. 5, 2008) (a low GAF score does not alone determine disability, but it is a piece of evidence to be considered with the rest of the record) (citation omitted); see also Escardille v. Barnhart, 2003 WL 21499999, at *5-6 (E.D. Pa. June 24, 2003) (remanding based in part on an ALJ's failure to address a GAF score of 50 "or its meaning regarding plaintiff's ability to maintain employment."); Wickramasekera v. Astrue, 2010 WL 3883241, at *26 (D. Ariz. Sept. 29, 2010) (remanding for

proper consideration of treating sources' GAF assessments, even though "a GAF score in the 45-50 range [does not] automatically result[] in a disability determination"). Accordingly, remand is necessary to consider and address this evidence in determining whether plaintiff's impairment is severe.

Furthermore, it was improper for the ALJ to selectively reference plaintiff's treatment records to support his conclusion that plaintiff's impairment was not severe, while ignoring other treatment records contradicting that conclusion, such as plaintiff's GAF scores and records from his hospitalizations. Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (stating that it is error for an ALJ to ignore or misstate the competent evidence in the record in order to justify her conclusion). See Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (stating that an ALJ is not permitted to reach a conclusion "simply by isolating a specific quantum of supporting evidence"); Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982) ("[A]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.") (citation omitted).

Moreover, "[j]udicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983) (finding that an ALJ's failure to explain why he disregarded medical evidence prevented "meaningful judicial review"). The ALJ's failure to explain why he ignored most of plaintiff's GAF scores prevents judicial review. Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981) ("Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that . . . [the] [C]ourt can determine whether the reasons for rejection were improper.") (internal citation omitted). Remand is warranted so that the ALJ may properly consider plaintiff's GAF scores. See Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988) (holding that an ALJ must "provide detailed, reasoned and legitimate rationales for disregarding [] physicians' findings"); see, e.g., Nelson v. Barnhart, 2003 WL 297738, at *4 (N.D. Cal. Feb. 4, 2003) ("Where an ALJ fails to 'give sufficiently specific reasons for rejecting the conclusion of [a physician],' it is proper to remand the matter for 'proper consideration of the physicians' evidence.'") (brackets in original) (citation omitted).

## B. PLAINTIFF'S CREDIBILITY

Plaintiff contends that the ALJ failed to make proper credibility findings and to properly consider plaintiff's subjective symptoms. [JS at 12-15.] As the ALJ's credibility determination was based, in part, on his analysis of the medical evidence -- an analysis that the Court finds was improper for the reasons discussed above -- the ALJ is instructed to reassess plaintiff's credibility after a reconsideration of the medical evidence.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision. See Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir.), cert. denied, 531 U.S. 1038 (2000); Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984). In this case, remand is appropriate for the ALJ to reassess the treating physicians' opinions and GAF scores, as well as plaintiff's credibility. The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: July 21, 2011

_/s/ Paul L. Abrams_
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE